**Brett CRAMER, et al., Plaintiffs,**

v.

**Lawton CHILES, in his official capacity as Governor of the State of Florida, et al., Defendants.**

No. 96–6619–CIV.

United States District Court, S.D. Florida.

Jan. 8, 1999.

1344

Marvin C. Gutter, Ellen M. Saiderman, Juliette E. Lippman, Ft. Lauderdale, FL, for plaintiffs.

Chesterfield H. Smith, Jr., Gordon B. Scott, Tallahassee, FL, for defendants.

## (CORRECTED) ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

FERGUSON, District Judge.

On January 9, 1998, this Court orally announced its Grant of Partial Summary Judgment, and on February 17, 1998, published several written orders. Pursuant to earlier orders and F.R.C.P. 52, the Court now enters the following Findings of Fact and Conclusions of Law.

### BACKGROUND FACTS

This action was brought against the State of Florida in June, 1996 as a class action on behalf of 2,176 persons with developmental disabilities residing in private intermediate care facilities. The main question is whether the State of Florida, by legislation, may summarily deny an eligible person with a developmental disability a choice between an intensive care facility or the Home and Community–Based Waiver program ("HCBW") for support and services.

Brett Cramer ("Cramer") and Danton Davis Smith ("Smith") were named plaintiffs in the original complaint. By order dated December 15, 1997, the complaint was amended to add Alan Abernathy, Raul Fowler, Harold Hollis, Gary Selph, and Michael Warren, as plaintiffs.

On August 28, 1996, this Court issued a Preliminary Injunction, finding that implementation of a newly enacted Florida Statute, HB 1621,[1] would pose irreparable harm to plaintiffs and members of the putative class and that plaintiffs had a likelihood of success on the merits. The new law would eliminate private Intermediate Care Facilities for the Developmentally Disabled ("ICF/DD,") while retaining state-operated Developmental Service Institutes ("DSIs") which have no present capacity to accommodate those persons who will be ousted from private ICF/DDs.

### JURISDICTION

The Court has jurisdiction of this matter under 28 U.S.C. § 1331 as the action arises under the laws of the United States, particularly, and under 28 U.S.C. § 1343(a) as this

1. House Bill 1621, a comprehensive enactment, expresses the legislative intent in section 11:

 [I]n order to both reduce the cost of serving individuals with developmental disabilities and provide appropriate alternative services to institutional care, privately-owned or operated facilities authorized to receive reimbursement through the Medicaid Intermediate Care Facility for the Developmentally Disabled program on June 30, 1996, shall no longer be reimbursed through that program but may continue to serve clients through noninstitutional funding mechanisms. It is further the intent of the Legislature that individuals who reside in state-owned-and-operated intermediate care facilities for the developmentally disabled shall continue to receive services financed through the Medicaid Intermediate Care Facility for the Developmentally Disabled program.

 1996, Fla.Laws ch. 96–417, § 11(2).

action is brought pursuant to 42 U.S.C. § 12131, 29 U.S.C. § 794, and 42 U.S.C. § 1983. Venue is proper under 28 U.S.C. § 1391(b).

Each individual plaintiff and each class member is "a qualified individual with a disability" within the meaning of 42 U.S.C. § 12131(2). Both the ICF/DD program and the HCBW program are public services subject to Title II of the ADA. *See* 42 U.S.C. § 12101, et seq.

### PLAINTIFFS

All named plaintiffs are individuals receiving Medicaid benefits. Each lived in privately operated ICF/DDs on June 30, 1996. Cramer, Alan Abernathy, Raul Fowler, Harold Hollis and Gary Selph still reside in ICF/DDs.

Plaintiff Brett Cramer is an eleven year old child with multiple disabilities. He has a severe mobility impairment and is also speech impaired. Cramer has undergone a number of surgeries to prevent further progressive spinal deformities. For the next several years he will require close observation, intense therapy and possible additional surgery. His father, Cyrus Cramer, is Brett's guardian and believes that his son's best chance to improve his physical abilities is to remain in an ICF/DD.

Plaintiff Smith is a 42 year old man with mental retardation. He was institutionalized at Sunland Center in Fort Myers in 1966 and was moved by state officials into the Hillsborough County Developmental Center in 1983. Smith was on a waiting list for a group home for years. Given that opportunity for the first time in April 1997, he moved to a small group home for six persons funded through the HCBW.

Plaintiff Alan Abernathy received public education until he turned 21 years old. A year after turning 21 (in about 1986), his family requested that he be placed in a residential program. At that time the State of Florida's Home and Community–Based Waiver was limited to day programming and did not provide adequate supports and services to meet Abernathy's needs. Since February 1991, he has been at the Liberty ICF/DD, a nursing-home type facility for 80 people, with as many as four people in a bedroom.

Plaintiff Harold Hollis, born in April 1946, was diagnosed with cerebral palsy and spastic quadriplegia. He has mild mental retardation, but is able to care for himself. Local school district officials barred his enrollment in public school because of the disabilities. State officials did not give him the choice of adequate supports in his family home in 1957 when, at age 11, he was institutionalized at Sunland Gainesville, a State institution, nor in 1965, when state officials moved him to Tallahassee Sunland. In 1983, state officials moved him again to the Tallahassee Developmental Center without a choice. Hollis prefers a house or apartment with a private bedroom in the community near his family. He is not in need of the high level of service which intensive care facilities are designed to provide.

Plaintiff Gary Selph is presently assigned to the Kincaid Cluster in Jacksonville, an ICF/DD. He brings this action by his mother and legal guardian, Betty Selph. Born with cerebral palsy, he has never been able to walk on his own or speak for himself. He has never had a choice of services. When he was born in 1963, no services were available to help his parents care for him at home. State officials gave him no choice, at age 11, when he was institutionalized at Sunland Tallahassee, nor in 1984, when the State closed the Tallahassee Developmental Center. Gary's family has long desired to have him in a small residential home.

Plaintiff Michael Warren is an 18–year–old with multiple disabilities who is nonambulatory and blind. When his father died, about six years ago, his mother felt she could not provide him adequate support at home. Although he clearly was not in need of twenty-four hour institutional care, state officials did not provide him with adequate support at home through the Home and Community–Based Waiver; the only choice offered his family was an ICF/DD. He had some communicative abilities when he lived at home which he lost or ceased to use after he began living in an ICF/DD. In 1997, Warren moved to his mother's home. He presently receives support and services through the

Home and Community–Based Waiver ("HCBW"). Prior to this action, none of the plaintiffs had a choice of living in small homes with adequate supports funded through the Home and Community–Based Waiver Program.

The Advocacy Center for Persons with Disabilities, Inc. is authorized to sue on behalf of plaintiffs Cramer, Smith, Abernathy, Fowler, Hollis, Selph and Warren. The Advocacy Center is also authorized to bring this action on behalf of the approximately 2,176 persons whom the Court, by order dated February 17, 1998, has certified as the class in this case. The class consists of individuals receiving Medicaid benefits who resided in private ICF/DDs as of June 30, 1997, and who currently reside in private ICF/DDs.

Counsel for the Smith plaintiffs are counsel for the class. Counsel for Cramer may continue to participate in the case on behalf of the Cramer plaintiff or any other members of the class who are opposed to a remedy which might eliminate ICF/DD services in violation of a beneficiary's statutory right to choose.[2]

### DEFENDANTS

LAWTON CHILES, Governor of the State of Florida, has been sued in his official capacity. His office is responsible for ensuring that the agencies of the State's Executive Branch, including the Department for Children and Families (DCF) and the Agency for Health Care Administration (AHCA), act in compliance with the Constitution and the laws of the United States.

EDWARD FEAVER, as Secretary of DCF, is responsible for the administration of human services including the Developmental Services Program and its related Medicaid Program in Florida. He is sued in his official capacity.

CHARLES KIMBER, an Assistant Secretary for DCF, is responsible for the control and administration of human services, including the Developmental Services Program and its related Medicaid Program in Florida. He is sued in his official capacity.

DONNA ALLEN, Chief of District Supports for Developmental Services, DCF, is responsible for control and administration of the Developmental Services Program and its related Medicaid Program in Florida. She is sued in her official capacity.

DOUG COOK, as the Director of the Agency for Health Care Administration (AHCA), is sued in his official capacity. He is responsible for administering the Florida Medicaid Program so that it complies with the Medicaid Act and other laws of the United States.

RICHARD LUTZ, the Director of the AHCA Division of Medicaid, is sued in his official capacity. He is responsible for Florida Medicaid operations and its compliance with the Medicaid Act and other federal laws.

### THE FEDERAL STATUTORY AND CONSTITUTIONAL FRAMEWORK, AND THE ICF/DD PROGRAM

#### Medicaid (Generally)

The Medicaid program, established by Title XIX of the Social Security Act, Title 42 U.S.C. § 1396, et seq., is a cooperative federal-state program which enables the states to furnish medical assistance to families and individuals who are unable to meet the costs of necessary medical services. 42 U.S.C. § 1396. Costs of the program are shared by federal and state governments, with the federal government contributing approximately 55% of the cost of services in Florida.

A state is not obligated to participate in the Medicaid Program. If it does elect to participate, however, it must operate its program in compliance with federal statutory and regulatory requirements. 42 U.S.C. § 1396a. Florida has chosen to participate in the Medicaid Program which must be in effect statewide. 42 U.S.C. § 1396a(a)(1); 42 C.F.R. § 431.50. Medicaid services must be comparable in amount, scope and duration to the medical assistance made available to individuals in other state plans, 42 U.S.C. § 1396a(a)(10)(B)-(E), and must be provided

---

**2.** During the pendency of this action, Plaintiff Cramer, through his father Cyrus Cramer, discharged the Advocacy Center. Cramer's second counsel was disqualified by this Court *sua sponte,* as having a conflict of interest in advocating for Cramer in this action while representing ICF/DDs in other litigation. Attorney Marvin Gutter, Esq. is Cramer's third counsel.

with reasonable promptness. 42 U.S.C. § 1396a(a)(8).

State plans must also provide an opportunity for a hearing to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.200, et seq. State officials, generally, must mail and give advance notice at least ten (10) days before the date of termination of or reduction in Medicaid benefits or services. 45 C.F.R. § 431.211. The purpose of the advance notice is to afford the recipient of the service an opportunity for a pre-termination hearing. 42 C.F.R. § 431.231(c).

### Intermediate Care Facilities for the Developmentally Disabled

The ICF/DD Program is an optional Medicaid service authorized by Title XIX of the Social Security Act. 42 U.S.C. § 1396d. ICF/DDs provide residential, health and rehabilitative services for individuals with developmental disabilities.

> Federal regulations define an ICF/DD as: an institution (or distinct part thereof) for the mentally retarded or persons with related conditions if-
>
> (1) the primary purpose of such institution (or distinct part thereof) is to provide health or rehabilitative services for mentally retarded individuals and the institution meets such standards as may be prescribed by the Secretary;
>
> (2) the mentally retarded individual with respect to whom a request for payment is made under a plan approved under the subchapter is receiving active treatment under such a program . . . .

42 U.S.C. § 1396d(d).

Federal statutes and regulations require that individuals in ICF/DDs receive active treatment including habilitation, occupational therapy, speech therapy and physical therapy. 42 U.S.C. § 1396d(d); 42 C.F.R. § 483.45. Florida has chosen to provide the optional ICF/DD service. FLA. STAT. § 409.906(14) (1995). Once a state chooses to provide an optional Medical service, it must comply with all federal requirements for that service. Private ICF/DDs provide some of these optional services to Medicaid-eligible individuals pursuant to contracts with the State of Florida.

The named plaintiffs and members of the plaintiff class are currently entitled to active treatment and other services at private ICF/DDs, which must meet standards prescribed by federal regulations. They have similar disabilities and virtually the same needs as those individuals who reside in state owned and operated ICF/DDs known as DSIs. A total of approximately 3615 individuals receive ICF/DD services, 1439 in state institutions and 2176 in private ICF/DDs.

The population of Florida's privately-operated ICF/DD programs is made up of: 1,312 individuals in institutions which house up to 120 persons; 504 individuals in 24–person clusters in state-owned privately-operated clusters; 120 individuals in privately-owned and operated clusters; and 240 individuals in 6–person ICF/DDs. Thus, only 11% of individuals housed in privately-operated ICF/DDs live in 6–person ICF/DDs which resemble typical homes and are located in residential neighborhoods. Clusters are groups of three buildings, housing eight individuals in each building, which typically resemble hospitals and nursing homes.

About 13% (258) of the class require 24 hour nursing care. Approximately 48% of individuals in the class are not in need of equipment for mobility. More than 80% of individuals in the class have normal hearing and more than 55% have normal vision. Nearly 40% of the individuals in the class are verbal. More individuals with medically fragile conditions are in private ICF/DDs than in state-operated DSIs.[3]

### The Home and Community–Based Waiver

In 1981, Congress created the Home and Community–Based Waiver Program in order that individuals who otherwise would be cared for in a nursing home or ICF/DD receive services in their own homes and in home-like settings. *See* S. REP. No. 97–139 & H.R. REP. No. 97–208, *reprinted in* 1981

---

**3.** The above breakdown of the class is comparable to that of developmentally disabled individuals receiving state Medicaid services throughout the nation. This includes persons with significant medical and social needs.

U.S.C.C.A.N. 396. The regulations provide that "Section 1915(c) of the Act permits States to offer, under a waiver of statutory requirements, an array of home and community-based services that an individual needs to *avoid institutionalization.*" 42 C.F.R. § 441.300 (emphasis added).

Under the waiver provisions of the Act, states may include as "medical assistance" the cost of home or community-based services which, if not provided, would require care to be provided in a nursing home or ICF/DD. 42 U.S.C. § 1396n(c); 42 C.F.R. § 435.217. Under the waiver, monetary respite is available for caregivers which enables family members and others to provide care in the community. Individuals in need of the type of care provided by ICF/DDs are eligible for the Home and Community–Based Waiver. Room and board may not be paid by Medicaid funds under the Home and Community–Based Waiver except in two circumstances: (1) to provide respite care and (2) where room and board is provided by an unrelated caregiver whose presence is necessary to avoid institutionalization. 42 U.S.C. § 1396n; 42 C.F.R. § 441.310(a)(2).

The Home and Community–Based Waiver provides for an individual support plan designed to meet the individual's needs for health and rehabilitative services in a home or in a small home-like setting. Indeed the program contemplates personal privacy and basic freedom to make choices, including choices about when to go to bed and arise. Participants may, to the extent they are able, plan menus, grocery shop and cook. Ideally, the individuals live in residential neighborhoods and have the opportunity to participate in community activities.

Florida first obtained approval in 1982 for day treatment services under a Home and Community–Based Waiver. A subsequent request for a comprehensive amendment to Florida's Home and Community–Based Waiver was approved in 1992. It adopts the philosophy of avoiding institutionalization, where not necessary, by providing supports and services in a person's own apartment, family home or home-like setting. After this lawsuit was filed Florida's Home and Community–Based Waiver was amended to include residential nursing, dental services and other essential supports.

Federal law sets a ceiling for funds used under the Home and Community–Based Waiver. Title 42 U.S.C. § 1396n(c)(2)(D) requires that "the average per capita expenditure estimated by the State in any fiscal year for medical assistance provided with respect to such individuals not exceed 100 percent of the average per capita expenditure that the State reasonably estimates would have been made in that fiscal year . . . if the waiver had not been granted. . . ." Thus, federal law permits states to fund Home and Community–Based Waiver up to the same average rate as ICF/DDs.

Congress further provided that a Home and Community–Based Waiver shall not be granted unless the State provides assurances that "necessary safeguards (including adequate standards for provider participation) have been taken to protect the health and welfare of individuals provided services under the waiver. . . ." 42 U.S.C. § 1396n(c)(2)(A); 42 C.F.R. § 441.302(a). Those safeguards must include "[a]dequate standards for all types of providers that provide services under the waiver." 42 C.F.R. § 441.302(a)(1).

Title 42 U.S.C. § 1396n(c)(2)(C) provides that individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded, be informed of (1) the feasible alternatives, if available under the waiver, and (2) that the beneficiary has a choice.

Before any individual may be moved to a Home and Community–Based Waiver program, a support coordinator must be selected by the individual or his guardian or legal representative, and a support plan must be prepared. Once needs are determined within the support plan, costs are assigned to provide that service. A cost plan lists each of the needed services along with the assigned cost to provide each of those services. When costs of support as deemed necessary under a plan exceed the costs of institutionalization, the individual may not be eligible for the Home and Community–Based Waiver.

Individuals who are in ICF/DDs are not eligible to receive Supplemental Security Income (SSI) benefits and receive instead a

small personal needs allowance. Individuals on the Home and Community–Based Waiver are eligible for SSI benefits. The maximum monthly SSI benefit is $494; individuals living in group homes receive a $72 personal needs allowance and the balance of $422 is generally applied to the cost of room and board. Individuals in the HCBW may also receive Social Security benefits (Disabled Adult Child benefits), based on their parents' work histories.

In order to live in their own homes, HCBW-eligible individuals often need subsidies in order to pay for room and board. Although Medicaid funds cannot pay for the room and board, the Department of Children and Families may provide stipends from general revenues. The residential habilitation element of the waiver provides for certain home supports that may be used to pay for room and board.

### House Bill 1621

Florida HB 1621 was to become effective as law on July 1, 1996. Secretary Feaver extended the ICF/DD program through August 31, 1996. On or about June 7, 1996, the state legislature adopted a budget funding ICF/DD and HCBW programs which the defendants are responsible for implementing. House Bill 1621 purported to terminate private ICF/DDs and replace them with Home and Community–Based Waiver services. Florida was to continue to receive federal funding (Medicaid) for large state-operated institutions with ICF/DD services. The 1996–1997 state budget reduced funding for the existing HCBW program and provided that ICF/DDs could provide services under the Home and Community–Based Waiver in the same institutions and nursing home type facilities, but without the regulatory requirements of ICF/DD. The reduction in funding for the HCBW program, with a simultaneous elimination of private ICF/DDs, placed the plaintiffs at imminent risk of irreparable harm, and constituted a violation of substantive and procedural rights as hereinafter described.

### UNDISPUTED FACTS

As an example of Florida's violations of federal law in 1996, the Court has considered, among other things, the evidence presented by Marion Smith, father and legal guardian of plaintiff Smith. Mr. Smith received a letter from the Hillsborough County Developmental Center, in August 1996, enclosing a form from Developmental Services to be signed by him in order that his son receive funding through the Home and Community–Based Services Waiver. The letter advised him to choose either Home and Community–Based Waiver services, which could be provided through his son's current facility, or institutionalization. It also indicated that if Mr. Smith chose institutionalization his son would not be illegible for services through the Hillsborough County Developmental Center and he would "be required to return home until the ICF/DD placement is available." There was no indication as to when, if ever, an ICF/DD would be available. On receipt of the notice Mr. Smith called to request a hearing. He was told that the law had changed; that his son was not entitled to continue receiving services after August 31 from a privately-operated ICF/DD, and that the closing of the ICF/DD where his son lived was imminent.

Under HB 1621 the Agency for Health Care Administration was to begin licensing facilities that are now licensed as ICF/DDs as "homes for special services," funded through the Medicaid HCBW, even though most facilities which receive ICF/DD funding are institutions housing 24 to 120 persons. Further, as already determined here, Medicaid funds cannot be used to pay room and board for individuals in a HCBW program.

After June 30, 1996, under HB 1621, ICF/DD services were to be available only in state-operated Development Services Institutions (DSIs). *See* Chapter 96–417, *supra* note 1. There are only four DSIs located in four counties in the State: Gulf Cost in Lee County, Landmark Learning Center in Dade County, Marianna Sunland in Jackson County, and Tacachale in Alachua County. Undisputedly, there are only 14–15 vacancies per year in these DSIs.

Obviously the plaintiffs and the entire class cannot move to DSIs. It is agreed to by the parties that movement of individuals from current ICF/DDs placements to DSIs would not be suitable or beneficial and there is evidence that some individuals would be

harmed by such a move. Many disabled individuals living in ICF/DDs today were moved there from state DSIs after an investigation uncovered inadequate and harmful conditions in some facilities. Further, according to the credible expert evidence presented, most individuals with developmental disabilities, including those with profound and severe disabilities, may benefit from living in small homes as opposed to large institutions. Florida, too, through its officials, has recognized that many individuals with developmental disabilities should be living in small-group homes, and has limited new private ICF/DDs with units providing living quarters to a maximum of six individuals.

Today, it is uniformly agreed among experts that noninstitutional individualized living is far superior, economically and medically, to traditional institutional housing for persons with developmental disabilities. For individuals with medically complex needs, mentoring/companion programs have been developed which enables eligible recipients to live in home settings with a caregiver who has the training necessary to meet the individual's needs. Consistent with the new reality and changing law Florida, in 1992, adopted the Home and Community-Based Waiver which allows individuals to receive necessary services in their own homes funded through Medicaid. Nevertheless, thousands of individuals continue to live, involuntarily, in large institutions. A chronic shortage of resources, attributable to low legislative priority in funding services for the developmentally disabled, is the primary cause.

Assistant Secretary Kimber testified it was the State's present intention to keep persons "in-place" in the ICF/DDs, which range in capacity from 24 to 120 persons. The defendants' intended implementation of HB 1621, it appears, would keep some of these class members in large institutions and nursing homes involuntarily, and would keep on an indefinite waiting list others who need and want institutional services.

### SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In this case, there are no genuine issues as to any material facts, and the issues to be decided are legal in nature.

### APPLICATION OF LAW TO FACTS

#### Eleventh Amendment

■ Plaintiffs' Medicaid claims fall squarely under the doctrine enunciated in the case of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); they are seeking prospective injunctive relief, i.e., an order that in the future the defendants comply with Medicaid law. The defendants assert immunity relying on *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The Eleventh Circuit's recent decisions in *Doe v. Chiles,* 136 F.3d 709 (11th Cir.1998), and *Tallahassee Memorial Regional Medical Center v. Cook,* 109 F.3d 693 (11th Cir.1997)(*per curiam*), control this issue. As found in those cases, this case "fits neatly within the *Ex Parte Young* exception. Like the hospitals in *Cook,* the [plaintiffs] in this case seek prospective injunctive relief to enjoin state officials from continuing to violate federal law, that is, the Medicaid Act." *Doe,* 136 F.3d at 720. The Defendants here enjoy no immunity from this suit.

#### Private Right of Action Under Medicaid

■ The defendants also contend that there is no private right of action to enforce the Medicaid provisions requiring procedural due process, 42 U.S.C. § 1396a(3), and freedom of choice, 42 U.S.C. § 1396n(c)(2). In *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Supreme Court held that Medicaid Act violations may be redressed under 42 U.S.C. § 1983, and that the Act provides substantive rights for individuals receiving Medicaid benefits.

The Court rejects the defendant's contention that the Eleventh Circuit's recent opinion in *Harris v. James,* 127 F.3d 993, 999

(11th Cir.1997), holds that "42 U.S.C. § 1396, et seq., did not create a private right of action enforceable under § 1983." *Harris* decided only the narrow issue of whether individuals receiving Medicaid benefits have a federal right to transportation which may be enforced in an action under § 1983. *See Harris,* 127 F.3d at 996; *see also Doe v. Chiles,* 136 F.3d at 714. In clarifying the limitation of its holding the court wrote "the transportation regulation would be valid not because it reasonably defines the content of rights created by the statutory provisions, as did the regulation in *Wright,* but only because the regulation furthers the broad objectives underlying each statutory provision." *Harris,* 127 F.3d at 1011. The court thus found that the links to Congressional intent were "too tenuous to support a conclusion that Congress has unambiguously conferred upon Medicaid recipients a federal right to transportation enforceable under § 1983." *Id.* at 1012.

More recently in *Doe,* 136 F.3d at 717, the Eleventh Circuit found that the requirement of 42 U.S.C. § 1396a(a)(8), that medical assistance be furnished with "reasonable promptness," was enforceable under *Wilder.* Here, as with the Boren Amendment to the Medicaid Act at issue in *Wilder,* the Medicaid statute and the corresponding regulations make compliance with the provisions in question a condition of receipt of federal funding. Similar to the Boren Amendment the salient Medicaid provisions are cast in mandatory terms, and the use of Medicaid funds is expressly conditioned on compliance with the provisions. 42 U.S.C. § 1396a; 42 C.F.R. § 430.35. The Court found that Medicaid's administrative scheme was not sufficiently comprehensive "to demonstrate a congressional intent to withdraw the private remedy of Section 1983." *Wilder,* 496 U.S. at 522, 110 S.Ct. 2510. *Wilder* sets forth three requirements as necessary to create a private right of action: (1) the statute must be intended to benefit the plaintiffs; (2) the provision must create an enforceable right and not merely state a congressional preference; and (3) the interest cannot be so vague and amorphous that it is beyond the competence of the judiciary to enforce. *See id.* at 509, 110 S.Ct. 2510.

In *Doe v. Chiles,* the Eleventh Circuit rejected the state's argument that the providers of services were the intended beneficiaries of the reasonable promptness clause. *See Doe,* 136 F.3d at 715 n. 13. The court stated, "[t]he plain language of the reasonable promptness clause is clearly intended to benefit Medicaid-eligible individuals." *Id.* at 715. It is not intended to benefit government agencies or private care providers.

Title 42 U.S.C. § 1396n(c)(2)(C) provides that States must ensure that:

> such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or an intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded....

Plaintiffs are plainly intended beneficiaries of 42 U.S.C. § 1396n. The freedom of choice provision creates binding obligations on any state that elects to provide supports and services in homes pursuant to the Home and Community–Based Waiver. In order to participate in the HCBW program states must provide:

> Assurance that when a recipient is determined to be likely to require the level of care provided in an ... ICF/MR, the recipient or his or her legal representative will be—
>
> (1) Informed of any feasible alternatives available under the waiver, and
>
> (2) Given the choice of either institutional or home and community-based waiver services.

*Doe,* 136 F.3d at 721 n. 21. The statutory language in question, "at the choice of such individuals," is unambiguous.

### Due Process

Medicaid statutes require that a state provide individuals with an opportunity for a hearing before the governmental agency when a claim for medical assistance is denied or is not acted upon with reasonable promptness, including where the Medicaid agency takes action to suspend, terminate, or reduce

services. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.200, et seq. The regulations further require that ten (10) days in advance of termination of Medicaid services state officials provide individuals who receive and apply for Medicaid benefits notice which must include:

(a) A statement of what action the State, skilled nursing facility, or nursing facility intends to take;

(b) The reasons for the intended action;

(c) The specific regulations that support, or the change in Federal or State law that requires, the action;

(d) An explanation of—

(1) The individual's right to request an evidentiary hearing if one is available, or a State agency hearing; or

(2) In cases of an action based on a change in law, the circumstances under which a hearing will be granted; and

(e) An explanation of the circumstances under which Medicaid is continued if a hearing is requested.

42 C.F.R. § 431.210.

■ As a general rule if the recipient requests a hearing before the date of action, the agency may not terminate or reduce services pending the hearing.

■ Procedural protections also apply when a state seeks to terminate an optional Medicaid program even for expressly lawful reasons. Thus, in *Eder v. Beal*, 609 F.2d 695 (3d Cir.1979), the court held that Pennsylvania was properly enjoined from terminating its program for individuals in need of eyeglasses to correct ordinary refractive problems until it complied with the Medicaid due process requirement.

■ Here, the state plan is not to terminate plaintiffs' ICF/DD services, but to convert their ICF/DD services to the Home and Community–Based Waiver, another Medicaid

program. Nevertheless, the statute requires that state officials provide individuals receiving Medicaid benefits with advance notice and an opportunity for a hearing to challenge denials, suspensions, terminations and reductions of services. The change in services required notice and an opportunity to be heard because it amounted to a reduction in services and was without the beneficiary's consent. Advance notice of an action adversely affecting services must include a "statement of what action the agency intends to take." 42 C.F.R. § 431.210(c).

In denying plaintiffs and class members adequate notice and an opportunity for a hearing to challenge the termination of the private ICF/DD program and continued benefits pending their appeals, defendants have violated federal Medicaid law and fundamental due process [4] requirements.

***Freedom of Choice***

■ Congress has mandated that individuals with developmental disabilities have, within cost limitations, freedom of choice regarding services. The challenged state plan violates 42 U.S.C. § 1396n(c)(2) because it gives beneficiaries no real choice. The beneficiary must choose between (1) a Home and Community–Based Waiver option which gives no assurance that the supports and services will meet individuals needs, and (2) a hope for a future ICF/DD placement. The defendants have admitted that selecting an ICF/DD placement means going on a waiting list for decades unless new facilities are found.

In *Doe v. Chiles*, the Eleventh Circuit held that individuals with developmental disabilities are entitled to ICF/DD services with reasonable promptness, upholding this Court's order that ICF/DD services or an alternative acceptable to the beneficiary be provided within 90 days. *See Doe*, 136 F.3d

---

4. In discussing the notice issue the parties have used the term "procedural due process" which I shun because it is, as one commentor observed, redundant. John Hart Ely, *Democracy and Distrust* 18 (1980). The word following "Due" in the Fourteenth Amendment is "Process" the writer notes, which is the same as procedure. Process is defined as a "normal course of procedure." BLACK'S LAW DICTIONARY 1205 (6th Ed.1992). By the same token, he continues,

"substantive due process" is a contradiction in terms.

A right in the constitutional sense, generally, is either substantive or procedural. Writers who use substantive or procedural to describe due process appear trapped and the work product may lack clarity. There is no doubt that this discourse on advance notice and opportunity to be heard is about procedural fairness. Saying it twice is unnecessary.

at 723. The appellate court further noted that its decision did not prevent defendants from shifting to an emphasis on the community-based services to individuals with developmental disabilities in accordance with federal statutory and regulatory dictates, including section 1396a(a)(8), which requires reasonable promptness. *See id.* at 719. *Doe* is also controlling and in effect buttresses this Court's decision on the propriety of a permanent injunction on the facts presented.

House Bill 1621 violates federal Medicaid law by effectively eliminating a choice between ICF/DDs and Home and Community–Based Waiver services.

### Americans with Disabilities Act

On July 12, 1990, Congress enacted the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, (ADA), finding that (1) "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2); (2) "discrimination against individuals with disabilities persists in ... institutionalization ... and access to public services." 42 U.S.C. § 12101(a)(3); and (3) "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, ..., segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(a)(5). Congress further found that:

> [i]ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.

42 U.S.C. § 12101(a)(7).

■ A major purpose of the ADA is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities and to provide clear, strong, consistent and enforceable standards addressing discrimination against these persons. 42 U.S.C. § 12101(b)(1), (2). Discrimination under the ADA includes segregation. *See Kimel v. State,* 139 F.3d 1426 (11th Cir.1998); *Zimring v. Olmstead,* 138 F.3d 893 (11th Cir.), *reh'g denied,* 149 F.3d 1197 (1998). Title II of the ADA provides that no qualified person with a disability shall be subjected to discrimination by a public entity. It is not disputed here that the defendants are subject to Title II of the ADA.

In order to prove a violation of Title II of the ADA the plaintiffs must show: (1) that they are "qualified individual[s] with a disability"; (2) that they were excluded from participation in, or denied the benefits of, some public entity's services, programs, or activities, or were otherwise discriminated against; and (3) that such discrimination was "by reason" of their disability. *See Concerned Parents to Save Dreher Center v. City of West Palm Beach,* 846 F.Supp. 986, 990 (S.D.Fla.1994).

■ Segregation is a form of discrimination prohibited by the ADA; as a matter of law integration is affirmatively required. Federal regulations adopted to implement the ADA statute provide that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Institutionalization of individuals with developmental disabilities, against their will, where less confining programs will satisfy their needs, violates the Americans with Disabilities Act's integration requirements.

■ Underfunding of the Home and Community–Based Waiver program compels institutionalization, thus negating a meaningful choice. The historical evidence suggests strongly that the practice of segregating nonviolent and functional individuals with developmental disabilities in isolated institutions was adopted because of unfair negative stereotyping. While articulating an intent to provide an alternative to institutional care, HB 1621 falls short and actually perpetuates an archaic system that does not permit eligi-

ble individuals to use available resources to move into residential settings.

 A state cannot provide services only in a segregated setting; it must provide services in the "most integrated setting appropriate to the needs of the individual." *See Helen L. v. DiDario*, 46 F.3d 325, 337 (3d Cir.), *cert. denied*, 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995). The fact that it is more convenient, either administratively or economically, to provide services in a segregated manner, is not a valid justification for denying a choice of services under Title II of the ADA. *See id.* at 337. The state must operate its Medicaid plan in compliance with Congress' pronouncement that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, and independent living . . . ." *See Helen L.*, 46 F.3d at 332 (citing 42 U.S.C. § 12101(a)(8)).

More recently, the United States District Court for the Northern District of Georgia in *L.C. v. Olmstead*, 1997 WL 148674 (N.D.Ga. 1997), *aff'd and remanded*, 138 F.3d 893 (11th Cir.1998), held that under the Americans with Disabilities Act "unnecessary institutional segregation of the disabled constitutes discrimination *per se*, which cannot be justified by a lack of funding." The *L.C.* court recognized that segregation of individuals with disabilities is a form of discrimination that Congress intended to eliminate, 42 U.S.C. § 12101(a)(2),(3),(5), and that regulations promulgated by the Attorney General to implement Title II prohibit unnecessary institutionalization.

House Bill 1621 and the defendants' expressed intent to use Home and Community-Based Waiver funds to provide services in populated institutions and nursing homes violates the Americans with Disabilities Act.

### CONCLUSION

The plaintiff's Motion for Summary Judgment is GRANTED and the defendant's are permanently enjoined from implementing HB 1621 in a fashion as would breach the federal-state contract for the delivery of Medicaid services and violate federal constitutional and statutory law.

Jurisdiction is retained to develop or approve a transition plan which preserves state legislative costreduction purposes, to the extent possible, without compromising legal rights of the plaintiffs as recognized in this Order.

Counsel for the defendants argues that the decision will force significant departure from past practices and will create administrative havoc in the absence of adequate funding and sufficient time for program structuring. The point is well-taken, however, the issues presented, as convincingly shown by credible expert testimony, are all too frequently matters of life and death for ICF–DDs beneficiaries. For that reason delays must be minimal.

To fashion an appropriate remedy the Court will appoint a panel of knowledgeable persons, agreed to by the parties, to develop a transitional plan and to develop service and support plans for individual beneficiaries desirous of noninstitutional care. The panel will have responsibility for establishing performance schedules and monitoring compliance.

Jurisdiction is also retained to enforce this order and to make awards for costs and fees.