Janet MAKIN and Robert Mullan, By and Through their mother and next friend Elizabeth RUSSELL; Brandon Delacruz, by and through his mother and next friend Charlotte Idao; Barbara Thai, by and through her sister and next friend Thoa Thai; Jeffrey Stubbs, by and through his mother and next friend Marilyn Stubbs, on behalf of themselves and all other similarly situated persons, and Kahua HoʻOmalu Kina, Inc., d.b.a. The Protection & Advocacy Agency of Hawaii, Plaintiffs,

v.

State of HAWAII; Benjamin Cayetano, in his capacity as Governor of the State of Hawaii; Susan M. Chandler, in her capacity as Director of the Department of Human Services of the State of Hawaii; Bruce Anderson, in his capacity as Director of the Department of Health of the State of Hawaii; Stan Yee, in his capacity as Chief of Developmental Disabilities Division of the State of Hawaii; Virginia Pressler, in her capacity as Deputy Director of Health Care Resources of the Department of Health of the State of Hawaii; Charles Duarte, in his capacity as Med–Quest Division Administrator, Department of Human Services of the State of Hawaii; Pat Snyder, in her capacity as Administrator of the Social Service Division of the Department of Human Services of the State of Hawaii; John and Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; and Other Doe Entities 1–10, Defendants.

No. CV 98–00997 DAE.

United States District Court,
D. Hawaiʻi.

Nov. 26, 1999.

1018

Matthew C. Bassett, The Protection and Advocacy Agency of Hawaii, Honolulu, HI, Rory S. Toomey, Law Office of Rory Soares Toomey, Honolulu, HI, Michael G.M. Ostendorp, Honolulu, HI, for plaintiffs.

Laurence K. Lau, Marlene Q.F. Young, Office of the Attorney General—State of Hawaii, Honolulu, HI, for defendants.

*ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND DENYING PLAINTIFFS' CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT*

EZRA, District Judge.

The court took both Plaintiffs' and Defendants' Motions for Summary Judgment under advisement on November 22, 1999. Matthew C. Bassett, Esq., and Shawn A. Luiz, Esq., appeared at the hearing on behalf of Plaintiffs; Laurence K. Lau, State Deputy Attorney General, appeared at the hearing on behalf of Defendants. After reviewing the Motions and the sup-

porting and opposing memoranda, the court DENIES Plaintiffs' Motion for Summary Judgment, and GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.

## BACKGROUND

In this civil class action case, Plaintiffs challenge the State of Hawaii's administration of its Medicaid Home and Community Based Services for the Developmentally Disabled or Mentally Retarded program ("HCBS–MR"). The certified class consists of mentally retarded people living at home who are on a wait list for services from Hawaii's HCBS–MR program and seek but cannot obtain the services because of a lack of state funding for the services.[1]

In their complaint, Plaintiffs raise seven causes of action: (1) Defendants violated the Americans with Disabilities Act ("ADA") because they discriminated against Plaintiffs by denying HCBS–MR services and violating the "Integration Mandate" of 28 C.F.R. § 35.130(d); (2) Defendants violated Section 504 of the Rehabilitation Act of 1973 by discriminating against Plaintiffs because of their disabilities; (3) Defendants violated Procedural Due Process and 42 U.S.C. § 1983; (4) Defendants violated the "reasonable promptness" provision of the Medicaid statute, 42 U.S.C. § 1396a(a)(8), by denying HCBS–MR services to Plaintiffs; (5) Defendants allegedly violated 42 U.S.C. § 1396n by allegedly funding institutional placement using HCBS–MR funds; (6) Defendants allegedly violated 42 U.S.C. § 1396n(2)(a) by allegedly providing inadequate services to individuals eligible for HCBS–MR services; and (7) Defendants violated 42 U.S.C. § 1396n(c)(2) by allegedly denying Plaintiffs "freedom of choice" of an appropriate HCBS–MR.

The Medicaid program, funded jointly by the federal and state governments, is designed to enable the states to provide medical assistance to individuals whose resources are insufficient to meet the costs of their medical needs. 42 U.S.C. § 1396 et seq. Under the Medicaid statute, a state is not required to participate in the Medicaid Program. However, if a state does participate, it must comply with federal statutory and regulatory requirements in its administration and execution of the program. 42 U.S.C. § 1396a. *See also, Schweiker v. Gray Panthers,* 453 U.S. 34, 37, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981). The State of Hawaii has elected to and does participate in the Medicaid program. Therefore, it must comply with the statute in its administration of the benefits under the program.

While certain services of Medicaid are mandatory, some other services under the statute are optional. *See* 42 U.S.C. § 1396d(a)(6)–(16), (18), (20), (22)–(25). Both the HCBS–MR and the Intermediate Care Facilities for the DD/MR ("ICF–MR") are optional services that the State of Hawaii has chosen to include in its program. *See* Hawaii Revised Statutes ("HRS") §§ 346–14, 346D, and 333F; Hawaii Administrative Rules ("HAR") § 17–1439–18. As with the mandatory provisions, if a state elects to provide optional services, it must comply with the Medicaid provisions covering those services. *See Weaver v. Reagen,* 886 F.2d 194, 197 (8th Cir.1989) ("Once a state chooses to offer such optional services it is bound to act in compliance with the Act and the applicable regulations in the implementation of those services").

### A. *Hawaii's HCBS–MR Program*

The HCBS–MR program in Hawaii is a Medicaid financial assistance program that is funded jointly by the state and federal government. Under the Medicaid statute, 42 U.S.C. § 1396n(c), the HCBS–MR program is optional. Section 1915(c) of the Act allows a state to offer, under a federal "waiver" of certain Medicaid statutory re-

---

1. Plaintiffs have requested subclass certification, but the disposition of this Motion does not depend on its outcome. Both the class and subclass will be equally affected by this Order.

quirements, an array of certain HCBS–MR services to qualified individuals. *See* 42 C.F.R. §§ 440.180, 441.300–441.310.

Congress created the Home and Community–Based Waiver Program to provide a way for individuals who would otherwise be cared for in a nursing home or ICF–MR to be cared for in their own homes or home-like settings. *See* S.Rep. No. 97–139 & H.R.Rep. No. 97–208, reprinted in 1981 U.S.C.C.A.N. 396; *See also, Cramer v. Chiles,* 33 F.Supp.2d 1342, 1347 (S.D.Fla. 1999). Under the waiver provisions, a state may

> include as 'medical assistance' ... the cost of home or community-based services ... approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan.

42 U.S.C. § 1396d(c)(1). Further, 42 U.S.C. § 1396a(a)(8) provides that assistance under the Act "shall be furnished with reasonable promptness to all eligible individuals." Also, 42 C.F.R. § 435.930(a)–(b) states that the state's administrative procedures cannot cause any delay in the state's furnishing of prompt services to Medicaid recipients, and the agency must "continue to furnish Medicaid regularly to all eligible individuals until they are found ineligible."

Under Section 1396a(a)(5), Medicaid must be administered or supervised by a single State agency. In Hawaii, the Hawaii Department of Human Services (DHS) administers the program under HRS § 346–17(7).[2] The state's HCBS–MR program offers a variety of services to its recipients that include, but are not limited to adult day health, habilitation, respite, nursing services, and transportation.

The objective of Hawaii's HCBS–MR program is to offer an alternative to institutionalization in ICF–MRs. Therefore, 42 U.S.C. § 1396n(c)(2)(C) provides that

> such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded *are informed of the feasible alternatives, if available under the waiver,* at the choice of such individual, to the provision of inpatient hospital services, nursing facility services, or services in the ICF/MR.

(emphasis added).

Importantly, the HCBS–MR program is part of a larger statutory scheme for the DD/MR that is administered by the Department of Health ("DOH") under HRS 333F and HAR 11–88.[3] According to Defendants, the HCBS–MR program is jointly operated by the DHS and DOH, and there are five steps involved in the program's admission process. First, the "DOH acts as a single point of intake for all the DD/MR services under HRS ch. 333F and HAR ch. 11–88–4(a)(1) and determines if a person meets State criteria defining developmental disabilities or mental retardation." Second, the DHS determines whether the person meets the requirements set out under the Medicaid statute. HAR § 17–1439–3(a)(1). Third, DOH determines whether there are sufficient funds to cover the individual's services. Fourth, the DHS determines what the appropriate level of care for the individual is under the circumstances. Fifth, if they qualify for the HCBS–MR pro-

---

**2.** The relevant Hawaii HCBS–MR statutes are HRS ch. 346D and Hawaii Administrative Rules ("HAR") ch. 17–1439.

**3.** Noteworthy was the closing of the Waimano Training School and Hospital (Waimano) by the DOH, which was an ICF/MR, on June 30, 1999. It was closed because the state now requires that the services provided by Waimano under the chapter be provided by the community or the DOH via the HCBS–MR program. Also, it is important to note that Plaintiffs allege that the DOH runs a crisis center for the DD/MR with HCBS–MR funding. Plaintiffs assert that this is a misuse of HCBS–MR funds.

gram, the individuals are admitted based on priorities provided in a state admission policy written on November 9, 1998.[4]

However, since the demand for HCBS–MR exceeds the available state funding for the program, a wait list exists. The DOH administers this wait list, which is comprised of people who meet the HCBS–MR requirements and request the services, but for whom a space in the program is not available. HRS § 333F–6(c) states that the DOH must keep "wait lists of all individuals who are eligible for services and supports, but for whom services and supports have not been provided for any reason." Also, the DOH must annually report on the lists and the reasons behind the lists to the legislature.

A wait list exists for the HCBS–MR because the State set "population limits" on the HCBS–MR program, to the extent of its appropriations. Throughout Section 333F of the HRS, the state limits the HCBS–MR services under the statute to "the ... state or federal resources allocated or available." See HRS §§ 333F–2(a), (b), (d), 333F–6(a), 333F–8(c), 333F–19, 333F–21. Section 333F–19 reads:

The responsibilities of the department to carry out this chapter shall be limited to the resources available to carry out this chapter in a prudent manner. When these resources are exhausted, no action may be brought by, or on behalf of, any person or organization in any court to compel the provision of services.

Further, the HRS states that "Medicaid home and community-based waiver program expenditures shall not exceed the amount authorized by the federal Health Care Financing Administration" ("HCFA"). HRS § 346D–2(c).

**B. *The Instant Case***

Though some facts are disputed, most pertinent facts in this case are not. For the State to participate in the Medicaid "waiver" program that serves as the basis of the HCBS–MR program, it had to submit an application to the HCFA for approval before the program began and it must continue to renew the application intermittently. A portion of the renewal application requests an estimate of the number of "unduplicated individuals" that the state expects to serve during the relevant years of the program.[5]

In a November 27, 1998 letter to the DHS from a Medicaid officer, the federal government approved an amendment of the State's most recent waiver renewal application regarding the number of people to be served by the HCBS–MR program, but the approval was

subject to [the State's] agreement to provide services for the lesser of the number of individuals listed in column "C" below [the number listed as the estimated amount of individuals to be served by the HCBS–MR program], or the number authorized by the State legislature and/or the State DOH by appropriation for that time period.

Defendants assert that this "number" sets a "population limit" on the number of individuals able to be served by the state HCBS–MR program. Plaintiffs, however, argue that no such population limit exists.

During the fiscal year ("FY") 1998–99, the HCBS–MR program had 976 slots authorized by the HCFA and the state served 971 individuals in the program throughout the year.[6] However, some in-

---

4. The admissions are prioritized in the following order: (1) emergency situations; (2) individuals needing services due to his caregiver's diminished ability to provide the necessary services, and no other viable alternatives are available; and (3) all remaining circumstances. November 9, 1998 Admission Policy letter.

5. In its most recent application, the State of Hawaii estimated, in column "C" of the appli-

cation, that it expected to serve 863 individuals during the fiscal year ("FY") 1997–98, 976 individuals during FY 1998–99, 1089 individuals during FY 1999–2000, and 1200 individuals during FY 2000–01.

6. Defendants fail to address reasons why they did not meet the alleged HFCA limit of 976 slots with individuals from the wait list or why they failed to fill the slots that were vacated throughout the year.

dividuals dropped out during the year for various reasons and the program started the 1999–2000 FY with only 949 clients.[7] With the average cost per individual at $25,452, the state will exceed the budgeted amount for the program ($10,960,669) by approximately $930,000 if it serves 949 clients for the entire year. Because of this alleged lack of state funding[8], the HCBS–MR program had a waiting list of 801 people as of September 30, 1999, many of which make up the class of Plaintiffs in this case.[9] Importantly, over 750 of the individuals on the waiting list have been in line for services for a period longer than 90 days, and some have been waiting for more than two years.

Though there is a question of fact surrounding the eligibility of some of the Plaintiffs in the class for the HCBS–MR program, the Defendants admit solely for the purpose of this Motion that the Plaintiffs are eligible for the Medicaid program and would meet the ICF–MR level of care necessary to enter the HCBS–MR program.[10] Defendants also admit that two named plaintiffs are eligible for general Medicare services and all named Plaintiffs receive "targeted case management." Also, according to Defendants, all the named Plaintiffs are on the HCBS–MR program waiting list because of lack of funds.

It is important to note that the services sought by Plaintiffs are available in institutions. However, Plaintiffs do not want to avail themselves to this option because they wish to continue to live in the community.[11]

On October 12, 1999, Plaintiffs moved for partial summary judgment on their 42 U.S.C. § 1983 claim, stating that Defendants violated the Medicaid statute by placing Plaintiffs on the HCBS–MR wait list for longer than 90 days. They asked for costs, attorney's fees and injunctive relief that requires the State to provide HCBS–MR services to all Plaintiffs on the wait list. Defendants filed its Opposition to the Motion on November 4, 1999 and Plaintiffs filed their Reply on November 12, 1999.

On October 22, 1999, Defendants also filed a Motion for Partial Summary Judgment on Plaintiffs' first, second, fourth, fifth and sixth causes of action. Plaintiffs filed their Opposition to the Motion and Cross–Motion for Partial Summary Judgment on November 4, 1999 and Defendants filed their Reply on November 10, 1999. Since the Plaintiffs' and Defendants' Motions are based on the same factual and legal arguments, the court will address both in this Order.

## STANDARD OF REVIEW

Rule 56(c) provides that summary judgment shall be entered when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the

---

7. Plaintiffs claim, without any factual basis, that the State did not start the FY with 949 clients.

8. Plaintiffs argue that because the state returned $417,776 to the state treasury from the DOH fund that funds the HCBS–MR, there was not a lack of funding for some of the individuals on the wait list. The State counters this claim by stating that the State simply overbudgeted during the past FY. They fail to state why they did not use the extra funds to serve 33 more individuals on the wait list for the HCBS–MR program.

9. As of June 9, 1999, the waiting list was 874 people.

10. Defendants claim that Plaintiffs are not eligible for the program or the ICF/MR level of care in Hawaii because they have not completed the DHS appropriate steps for eligibility, namely the DHS 1150 level of care determination. Plaintiffs argue that this is not necessary and they are all eligible for the program.

11. Plaintiffs do not make any claim of intentional discrimination based on disability by the State.

court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548.

Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *Id.* The evidence submitted by the nonmovant, in opposition to a motion for summary judgment, "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. *Id.* at 254, 106 S.Ct. 2505. The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir.1990). The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. *Id.* (citation omitted).

## DISCUSSION

In their Motion for Partial Summary Judgment, Plaintiffs argue that they are entitled to injunctive relief, as well as attorney's fees and costs, under 42 U.S.C. § 1983 because Defendants allegedly violated the Federal Medicaid Act, 42 U.S.C. § 1396 et seq., when they placed Plaintiffs, a class of over 750 individuals, on a wait list for HCBS–MR services for longer than 90 days. Defendants responded by asserting that they did not violate the Act because Plaintiffs are not "eligible" for the services [12] and the Act and its regulations authorize "population limits" on HCBS–MR services.

In their Motion for Partial Summary Judgment, Defendants argue that because the Medicaid statute provides for "population limits," they are not in violation by maintaining a wait list of individuals for the HCBS–MR services for longer than 90 days. As a result, they claim that Plaintiffs' Complaint seeks more than the Medicaid statute, or the Rehabilitation Act ("RA") require. They also claim that Plaintiffs seek more than the Americans with Disabilities Act ("ADA") requires or can provide for under the Constitution. Further, they assert that Plaintiffs seek a

---

12. However, Defendants concede, solely for the purposes of this Motion, that Plaintiffs are "eligible" for the HCBS–MR services.

"fundamental alteration" of the State's Medicaid program, which is not allowed under federal law. Consequently, Defendants contend that they are entitled to summary judgment on the following claims:

(1) Defendants violated the Americans with Disabilities Act ("ADA") because they discriminated against Plaintiffs by denying HCBS–MR services and violating the "Integration Mandate" of 28 C.F.R. § 35.130(d);

(2) Defendants violated Section 504 of the Rehabilitation Act of 1973 by discriminating against Plaintiffs because of their disabilities;

(4) Defendants violated the "reasonable promptness" provision of the Medicaid statute, 42 U.S.C. § 1396a(a)(8), by denying HCBS–MR services to Plaintiffs;

(5) Defendants violated 42 U.S.C. § 1396n by allegedly funding institutional placement using HCBS–MR funds;

(6) Defendants allegedly violated 42 U.S.C. § 1396n(2)(a) by allegedly providing inadequate services to individuals eligible for HCBS–MR services.

Since the interpretation of the Medicaid statute, namely whether it provides for "population limits" on the number of "slots" available in the HCBS–MR program, represents the integral issue in this case, the court will approach it first. Then, the court will examine both parties' Motions in turn.

## A. *Interpretation of the Medicaid Statute*

Plaintiffs argue that the Medicaid statute clearly conditions the State's receipt of HCBS–MR funds on promptly providing HCBS–MR services to everyone that qualifies; regardless of availability of funds. Further, they claim that the State is violating this requirement since Plaintiffs have been waiting for services for longer than federal regulations allow. They base this conclusion on the Medicare statute's "reasonable promptness" provision, 42 U.S.C. § 1396a(a)(8), which reads as follows:

A State plan for medical assistance must ... provide that all individuals wishing to make application for medical assistance under the plan shall have an opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals.

Plaintiffs also argue that 42 C.F.R. § 435.911[13] provides that services must be delivered within 90 days of eligibility approval; however, this regulation does not implement the "reasonable promptness" provision. Rather, it establishes the time limit on a state's determination of an applicant's eligibility for the program.

Plaintiffs further claim that Defendants are in violation of 42 C.F.R. § 441.302(d)(1)–(2)[14] since they are not giving Plaintiffs a choice between ICF–MR facilities and HCBS–MR services. Lastly, they assert that the state fails to give the individuals a choice of services they prefer, in violation of 42 U.S.C. § 1396n(c)(2)(C).[15]

---

**13.** This section reads as follows: "The agency must establish time standards for determining eligibility and inform the applicant of what they are. These standards may not exceed ... (1) Ninety days for applicants who apply for Medicaid on the basis of disability."

**14.** 42 C.F.R. § 441.302(d)(1)–(2) requires that the state provide assurances that "the recipient or his or her legal representative will be (1) informed of any feasible alternatives available under the waiver; and (2) given the choice of either institutional or home and community-based services."

**15.** 42 U.S.C. § 1396n(c)(2)(C) requires that the State provide assurances that "such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility or ICF/MR are informed of the reasonable alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in ICF/MR."

Defendants counter Plaintiffs' allegations of the State's non-compliance with the Medicaid statute by arguing that the relevant statutes and regulations do not clearly require the State to provide the services under the HCBS–MR program that the Plaintiffs claim. Rather, Defendants argue that "the Medicaid statute and its administering federal agency have authorized the State's population limits on the services" under 42 U.S.C. § 1396n(c)(2)(C), (c)(9),[16] (c)(10)[17] and 42 C.F.R. § 441.303(6).[18] *See* State Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 3. In sum, Defendants claim that they are in compliance with the federal statute and Plaintiffs are not entitled to HCBS–MR services since there are no available slots in the program.

Under well established canons of statutory interpretation, if the language of a statute is clear and unambiguous, the court will apply the plain meaning of the language unless a plain meaning interpretation would lead to an absurd result or a result at odds with the legislature's intent. *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n*, 447 U.S. at 108, 100 S.Ct. 2051.

Further, it has long been "recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In reviewing an agency's construction of the statute which it administers, the court should apply the principles of deference described in *Chevron* by asking whether "the statute is silent or ambiguous with respect to the specific issue" before it and if so, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 842–843, 104 S.Ct. 2778.

While the agency's interpretation of the statute is due deference from the court, the court must examine the construction and independently determine whether it has a "reasonable basis in law." *NLRB v. Hearst Publications*, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) ("Undoubtedly questions of statutory interpretation, especially when arising in the first instance in judicial proceedings, are for the courts to resolve, giving appropriate weight to the judgment of those whose special duty is to administer the questioned statute"). Consequently, the courts are the final authority on the meaning of statutes, as they must reverse the administrative agency's interpretation or administration of the statute if it does not comply with clear Congressional intent. *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965) ("Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with

---

**16.** This section provides: "In the case of any waiver under this subsection which contains a limit on the number of individuals who shall receive home or community-based services, the State may substitute additional individuals to receive such services to replace any individuals who die or become ineligible for services under the State plan."

**17.** This section reads: "The Secretary shall not limit to fewer than 200 the number of individuals in the State who may receive

home and community-based services under a waiver under this subsection."

**18.** This section reads: "The State must indicate the number of unduplicated beneficiaries to which it intends to provide waiver services in each year of its program. This number will constitute a limit on the size of the waiver program unless the State requests and the Secretary approves a greater number of waiver participants in a waiver amendment."

a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions"); *See also, Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981) ("The interpretation put on the statute by the agency charged with administering it is entitled to deference, [citations omitted], but the courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute, whether reached by adjudication · or by rule-making, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement").

■ As stated above, when a state accepts federal funds under the Medicaid statute, it must comply with the federal conditions provided in the statute. However, it is also clear that "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously ..., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793,· 97 L.Ed.2d 171 (1987) (quoting *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). Thus, Congress must clearly indicate what obligations the State must perform to receive federal funds.

■ Initially, on the face of the statute, it is clear that the statute requires "reasonable promptness" by the State in its provision of services under 42 U.S.C. § 1396a(a)(8). However, the statute and regulations by the agency are silent on an exact time period that constitutes an "unreasonable period." But here the State says it has no obligation to provide any services since it has limited funds.

Second, it is clear that 42 U.S.C. § 1396n(c)(2)(C) and 42 C.F.R.

§ 441.302(d) require the State to inform eligible individuals of "feasible alternatives, if available under the waiver" and allow the individuals to choose from the available alternatives.

The statute and regulations provide for limits on HCBS–MR services and further provide they are not to be considered "available" under the statute when the slots are filled. *See* 42 U.S.C. § 1396n(c)(2)(C), (c)(9), & (c)(10); 42 C.F.R. § 441.303(6). Therefore, under the Medicaid statute, the State need not provide services to new "eligible" individuals until slots become available.

Initially, section 1396n(c)(9) provides· that if the State program "contains a limit on the number of individuals who shall receive" HCBS–MR services, "the State may substitute additional individuals to receive" the services to replace people who· died or became ineligible for them. Second, section 1396n(c)(10) contains a limitation on the Secretary regarding the limits that he or she may allow a State to place on the programs. It sets a minimum number of individuals in a HCBS–MR program at 200 people. It is also important to note that there is no language in the statute providing for these "limits" on the ICF/MRs, suggesting that there is reason to treat the programs differently. Thus, Congress has provided states with the authority to set limits on the amount of slots available in an HCBS–MR program, and at the very least, the statute is ambiguous concerning whether "limits" are allowed.

Fortunately, the agency regulations clear up any ambiguity or doubt that the statute may have created. In 42 C.F.R. § 441.303(6), the HCFA states that the State *must* provide the number of individuals that it intends to grant HCBS–MR services to in each· of the years covered by the waiver application. Then, it states that "this number *will constitute a limit on the size of the waiver program*" unless the State requests ·a greater number and the Secretary approves it. Once the Secretary. of the HCFA approves the number,

it becomes the "population limit" on the HCBS–MR services. The court must defer to the agency's regulation since it does not contradict the intent or purpose of the statute. Thus, it is clear that the Medicaid statute and its regulations require the State to provide a number to the Secretary that will act as the limit on the State's HCBS–MR program every year. As a result, when the slots are filled by eligible individuals, the HCBS–MR program is no longer a "feasible alternative" available under the waiver. Stated differently, the HCBS–MR program is not an entitlement.

Both parties have cited a number of cases interpreting the Medicaid statute, though all are distinguishable on these facts from this case since they do not cover the "population limits" provisions of the statute and many do not even treat the HCBS–MR "waiver" program under the Medicaid statute. Nevertheless, several of them are instructive.

*Doe v. Chiles*, 136 F.3d 709 (11th Cir. 1998), held that ICF/DD services must be provided within 90 days of an eligibility determination under section 1395a(a)(8). This case provides an application of the "reasonable promptness" standard with regard to ICF/DDs. However, as the Defendants pointed out, the case did not deal with HCBS–MR and ICF–DDs do not have "population limits." In effect, they are entitlements once a State offers them. However, in this case, the ICF–MRs are not full and the Plaintiffs could utilize them if they so desire.

In *Benjamin H. v. Ohl*, Civ. No. 3:99–0338 (S.D.W.V.1999), the West Virginia court enjoined the State to develop a compliance plan to eliminate wait lists and establish reasonable time frames for the provision of ICF–MR to qualified individuals. The court held that a lack of slots was not a reasonable excuse by the state because "states could easily renege on their part of the bargain by simply failing to appropriate sufficient funds." While this case raises the issue of the State's duty to appropriate its funds properly, it does not address the issue of whether approved

HCBS–MR "population limits" allow a state to deny individuals HCBS–MR when the limit is reached.

Plaintiffs have cited numerous cases for the proposition that "inadequate state appropriations do not excuse noncompliance with the Medicaid Act." *Doe*, 136 F.3d at 722; *See also Alabama Nursing Home Ass'n v. Harris*, 617 F.2d 388, 396 (5th Cir.1980). However, this again does not address Defendants' actions in this case since the Medicaid Act allows for the "population and financial limits" on HCBS–MR services the state utilizes.

In sum, while the Medicaid Act requires a state to offer feasible alternatives available under the waiver to all eligible individuals, the HCBS–MR program is not "available" under the statute when the slots available under the "population limit" have been filled. Thus, the State of Hawaii is in compliance with the Medicaid statute even if there are over 750 "eligible" individuals on the HCBS–MR wait list so long as there is other appropriate treatment available to them under the Medicaid program. The HCFA Secretary approved the State's "population limit" for the HCBS–MR program and nothing in the statute requires the State to provide HCBS–MR services beyond the limit.

### B. *Plaintiffs' Motion*

Plaintiffs seek injunctive relief and attorney's fees and costs under 42 U.S.C. § 1983, based on the allegation that Defendants violated the Medicaid Act. Though Plaintiffs may have a claim under 42 U.S.C. § 1983 if Defendants were in violation of the Medicaid Act, as indicated above this court has determined that Defendants are not required to provide HCBS–MR services to individuals if the "population limit" has been reached. Further, at best Plaintiffs have established a question of material fact as to the State's failure to provide the services under the Act by showing that the State had excess HCBS–MR funds and that it returned some money to the State Treasury. Also,

the State did not fill all the available slots during the last FY. Therefore, Plaintiffs' Motion for Partial Summary Judgment is DENIED.

### C. *Plaintiffs' Cross–Motion*

■ In its Cross–Motion filed November 4, 1999, Plaintiffs raise additional claims in response to Defendants' Motion. Defendants claim that Plaintiffs' counter motion for summary judgment should be dismissed because Plaintiffs filed the cross-motion within 28 days of the hearing date in violation of Local Rule 7.2. Also, the March 30, 1999 Scheduling Conference Order barred the filing of any motions after November 1, 1999, and Plaintiffs filed their motion for summary judgment on November 4, 1999. Plaintiffs request that the court permit the filing of their Counter Motion since it is closely related to Defendants' motion.

The Scheduling Conference Order states that all motions shall be filed by November 1, 1999 and "all motions deadlines stated herein will be strictly enforced. After such deadline the parties may not file such motions except with leave of court, good cause having been shown." Also, the court limited the parties to one summary judgment motion, unless otherwise ordered by the court.

The scheduling order "control[s] the subsequent course of the action" unless modified by the court. Fed.R.Civ.P. 16(e). Orders entered before the final pretrial conference may be modified upon a showing of "good cause," Fed. R.Civ.P. 16(b).... [*see*] *U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff,* 768 F.2d 1099, 1104 (9th Cir.1985) (court may deny as untimely a motion filed after the scheduling order cut-off date where no request to modify the order has been made); *see also Dedge v. Kendrick,* 849 F.2d 1398 (11th Cir.1988) (motion filed after the scheduling order cut-off date is untimely and may be denied solely on that ground). *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 608 (9th Cir.1992).

Here, Plaintiffs filed their first motion for partial summary judgment on October 12, 1999, well before the court imposed deadline. Then, Plaintiffs filed its cross-motion on November 4, 1999, raising issues that could have been raised in its initial filing. Although Plaintiffs were well aware of the deadlines imposed by the Scheduling Order, Plaintiffs did not specifically request that the court modify its Scheduling Order, nor did it seek relief from the Scheduling Order, as it was entitled to do. Furthermore, although Plaintiffs may argue that this court should consider Plaintiffs' summary judgment motion as a defacto motion to amend the Scheduling Order, Plaintiffs failed to show "good cause" for their untimely motion.

Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension" ... the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.

*Johnson,* 975 F.2d at 609 (citations omitted).

Here, Plaintiffs do not set forth any explanation for their untimely motion. Plaintiffs could have raised these claims in their initial motion for partial summary judgment. Plaintiffs were fully aware of any arguments they may have made in support of their claims. Plaintiffs' counter motion is based upon a question of law regarding the interpretation of the statutes in question. It is not as if Plaintiffs' motion was based on facts or theories which were not apparent to Plaintiffs until the Defendants filed their motion. Plaintiffs did not need to wait for Defendants to file a motion in order for Plaintiffs to be able to file their counter motion. Moreover, Plaintiffs could have sought permission of this court to file their motion after the Scheduling Order deadline. Thus, the

court finds that Plaintiffs did not conduct the necessary due diligence which could show good cause to amend the Scheduling Order.

A scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." ... Disregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation and its standards may not be short-circuited.

*Johnson*, 975 F.2d at 610 (citations omitted).

Thus, this court DENIES Plaintiffs' counter motion for summary judgment as untimely filed without prejudice to the issues raised therein.

### D. *Defendants' Motion*

In their Motion, Defendants argue that the court should grant summary judgment on the following claims made by Plaintiff: (1) Defendants violated the "reasonable promptness" provision of the Medicaid statute, 42 U.S.C. § 1396a(a)(8), by denying HCBS–MR services to Plaintiffs; (2) Defendants violated 42 U.S.C. § 1396n by allegedly funding institutional placement using HCBS–MR funds; (3) Defendants violated 42 U.S.C. § 1396n(c)(2)(a) by allegedly providing inadequate services to individuals eligible for HCBS–MR services; (4) Defendants violated the Americans with Disabilities Act ("ADA") because they discriminated against Plaintiffs by denying HCBS–MR services and violating the "Integration Mandate" of 28 C.F.R. § 35.130(d); (5) Defendants violated Section 504 of the Rehabilitation Act of 1973 by discriminating against Plaintiffs because of their disabilities. Each claim will be examined in turn.

### 1. *The "Reasonable Promptness" Claim*

■ As determined above, Defendants did not violate Section 1396a(a)(8) of the Medicaid Act by failing to provide all Plaintiffs with HCBS–MR services because the State is only required, under the provision, to provide available "medical assistance" with reasonable promptness. Further, the HCBS–MR services are not "available" if the "population limits" are reached when the eligible individual requests them.

Plaintiffs attempt to use case law to show that lack of resources and funds are not an excuse for failing to provide statutory entitlements. The court agrees with this since a state must comply with federal conditions on federal funds. However, as Defendants correctly argue, Plaintiffs have no entitlement to the HCBS–MR services under the statute unless there are open slots within the "population limits" that can be filled. Clearly, in this case, there are not enough slots available to provide HCBS–MR services to the entire Plaintiffs' class.

A few cases address the "reasonable promptness" provision, but importantly, none directly address the effect of "population limits." *See, e.g., Benjamin H.*, Civ. No. 3:99–0338 (S.D.W.V.1999) (holding that lack of funds is not an excuse to deny individuals' requests for ICF–MR services but does not address the effect of approved "population limits" on the HCBS–MR services. Also, the Plaintiffs had no alternatives available since the ICF–MRs were full); *Doe*, 136 F.3d at 709 (holding that the state violated the "reasonable promptness" provision by keeping people on a wait list for ICF/DDs for a year or longer, but did not cover federally approved HCBS–MR "population limits"); *Sobky v. Smoley*, 855 F.Supp. 1123, 1146–49 (E.D.Cal.1994) (holding that service delays caused by insufficient funding of treatment slots violated the "reasonable promptness" provision, but the pertinent program did not have any federally approved population limits). Therefore, since no law or statutory language provides Plaintiffs with any entitlement to these services once the "population limits"

are filled, Defendants have not violated the "reasonable promptness" provision by maintaining wait lists for HCBS–MR programs. Under the statute, the State is only required to provide services for the number of individuals approved by the HCFA, or the State legislature. This is particularly true since there is space available in the ICF/MR facilities that provides Plaintiffs with possible alternative treatment.[19] As a result, Defendants' Motion for Partial Summary Judgment is GRANTED to the extent it covers Plaintiffs, "reasonable promptness" claim as to the filled slots. However, the Motion is DENIED as to the so-called "unfilled" slots since Defendants have not provided any justification for their failure to fill them.

### 2. The Misuse of Funds Claim

In their fifth cause of action, Plaintiffs allege that Defendants violated section 1396n of the Medicaid Act by funding institutional placement with HCBS–MR funds. They argue that the Defendants appropriation of funds violates the financial accountability requirement of 42 C.F.R. § 441.302(b), which reads, in pertinent part: "The agency will assure financial accountability for funds expended for HCBS–MR."

Plaintiffs make numerous unsupported claims concerning Defendants' use of HCBS–MR funds, such as Defendants' provision of "100% state funded respite services" and that "Defendants had enough funds to provide 160 extra people with HCBS–MR services last year." Under the State's budget, the ICF–MR and HCBS–MR state match funds are part of the same state budget code and the DOH allocates the funds between the two programs. However, the record before the court is not clear on why the State allowed $417,776 of funds to lapse during the 1998–99 FY, rather than use the funds to serve people on the HCBS–MR wait list to fill

available slots. Plaintiffs also claim that the Defendants run an ICF–MR, under the guise of a crisis center, at Waimano using HCBS–MR funds in violation of the Medicaid statute.

■ There are questions of material fact concerning the State's allocation of its funds since there were some remaining unfilled slots available at the end of last FY and the State allowed $417,776 to lapse without an explanation. If they failed to fill the available slots in order to allow for funding of institutions, this would violate the Medicaid statute.

Because of the existence of questions of material fact, Defendants' Motion is DENIED to the extent it covers Plaintiffs' claim of misallocation of funds to institutions.

### 3. The "Inadequate HCBS–MR" Claim

■ In their sixth cause of action, Plaintiffs claim that Defendants are in violation of 42 U.S.C. § 1396n(c)(2)(A) because they provide inadequate services to individuals eligible for HCBS–MR. Further, they allege that Defendants have not provided "sufficient resources to protect the health and welfare of individuals provided services under the HCBS–MR." Also, Plaintiffs claim that Defendants violated 42 U.S.C. § 1396n(c)(2)(C) by denying them "freedom of choice" between HCBS–MR and ICF/MR services.

Section 1396n(c)(2)(A) states:

A waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that—

(A) necessary safeguards ... have been taken to protect the health and welfare of individuals provided services under the waiver and to assure financial accountability for funds expended with respect to such services.

---

**19.** Though Plaintiffs allege that the ICF–MR facilities are full, there is nothing in the rec-

ord before this court to establish this.

As the Defendants correctly argue, this provision covers the quality of service and does not apply to the Plaintiffs on the wait list because of lack of slots. As stated above, Plaintiffs are not entitled to HCBS–MR services because the slots are filled. Therefore, this provision is not triggered. Since the HCFA Secretary approved the waiver application of the State and no evidence shows that the individuals who receive services are not adequately provided for under the program, Plaintiffs' claim lacks substance.

■■■ As for Plaintiffs' "freedom of choice" claim, they argue that Defendants violate their rights by failing to offer a choice between ICF–MRs and HCBS–MR services. They claim that Plaintiffs are entitled to these services under the Medicaid Act, section 1396n(c)(2)(C), which provides that "such individuals who are determined to be likely to require the level of care provided" in various institutions or programs must be "informed of the feasible alternatives, *if available under the waiver*, at the choice of such individuals, to the provision of the various institutions or services" (emphasis added). Though this requires the State to give the Plaintiffs a choice from among the services, it only requires it to allow a choice from among the "available" services. Unfortunately, when the spaces are filled in the HCBS–MR program, it is no longer "available" under the waiver. This remains the case regardless of whether there is a wait list for the services. Since no regulation or other law provides a different result regarding the "population limits" of the HCBS–MR programs and the Plaintiffs are not claiming that they have no other alternatives under the waiver program, the Plaintiffs have no valid "freedom of choice" cause of action under the Medicaid statute in this case.

Thus, Defendants' Motion is GRANTED to the extent it covers Plaintiffs' claims based on 42 U.S.C. §§ 1396n(c)(2)(A) or (C) since Plaintiffs are not entitled to the HCBS–MR services under the Medicaid statute once the "slots" are filled by other eligible individuals.

### 4. The ADA "Integration Mandate" Claim

Plaintiffs also claim that the Defendants violated the ADA and its "Integration Mandate" by denying Plaintiffs' HCBS–MR services under the waiver statute. The pertinent provision under Title II of the ADA is 42 U.S.C. § 12132.[20] The "integration mandate," 28 C.F.R. § 35.130(d), is at the crux of the case and reads as follows:

> A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

Further, Plaintiffs argue that Defendants must amend their program under the "reasonable modification" clause, 28 C.F.R. § 35.130(b)(7), which states:

> A public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

### 5. Defendants' Sovereign Immunity Claim

■■■ In their Motion, Defendants argue that the facts of this case provide that the State is immune from both the ADA and Rehabilitation Act claims. However, as the Defendants concede, the Ninth Circuit has upheld the ADA's and RA's abrogation of Eleventh Amendment immunity as a valid act of Congressional power. *Clark v. State of California*, 123 F.3d 1267 (9th

---

**20.** This section reads, in pertinent part, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

Cir.1997), held that both the ADA and RA were validly enacted under section 5 of the Fourteenth Amendment. Also, the court ruled that both explicitly state that "a State shall not be immune under the Eleventh Amendment" pursuant to either Act. *Id.* at 1269–70; *See also,* 42 U.S.C. § 12202; 42 U.S.C. § 2000d–7(a)(1).

Defendants claim that the statutes exceed the authority of section 5 of the Fourteenth Amendment because they claim that if the court requires the State to provide HCBS–MR services they will be providing them with a positive entitlement without a constitutional violation. However, this argument is misplaced because if the State is found to have discriminated against the Plaintiffs in any manner based on their disability, the court may remedy that discrimination by requiring the State to modify their program under the ADA or RA. There is no reason provided by the Defendants to distinguish the Ninth Circuits' previous rulings holding that the ADA and RA have abrogated Eleventh Amendment immunity for the States when disabled individuals are being discriminated against.

In sum, if Plaintiffs can sustain a claim under the ADA or RA of discrimination against their class, the State has no immunity claim under these provisions because of Congressional abrogation. Therefore, the only relevant question is whether the Plaintiffs have been discriminated against by the State because of the State's failure to provide them with HCBS–MR services.

### 6. *The "Integration Mandate" and "Reasonable Modification" Clause of the ADA*

 Under the ADA, Congress states that isolation and segregation of disabled individuals is a pervasive form of discrimination in our country. 42 U.S.C. § 12101(a)(2). Congress also was concerned with "discrimination against individuals with disabilities" in "such critical areas as … institutionalization … and access to public services." 42 U.S.C. § 12101(a)(3). Consequently, Congress required the Attorney General to implement the statute with regulations to remedy the problem. 42 U.S.C. § 12134(a). The "integration regulation" and "reasonable modification" clause were results of that Congressional order.

The case of *Olmstead v. Zirming,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), provides guidance with regard to these provisions. In Olmstead, the plaintiffs were patients in institutions who challenged their confinement in a segregated environment. Defendants claim that this fact distinguishes the case from the instant case since Plaintiffs are living at home and not in institutions. However, this argument is misplaced since the only alternative for Plaintiffs presently is institutionalization if they seek treatment under the statute.[21]

Further, the ADA anti-discrimination policy does not require discrimination between different groups of disabled people. *Williams v. Wasserman,* 937 F.Supp. 524, 530 (D.Md.1996). The Supreme Court held that "unjustified isolation, …, is properly regarded as discrimination based on disability" under the ADA and its regulations. *Id.* 119 S.Ct. at 2185. This determination provides the reasoning underlying the "integration mandate," as the preamble to the Title II regulations states that "the most integrated setting appropriate to the needs of qualified individuals with disabilities" is "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. A.

---

**21.** In this case, there is a question of material fact concerning whether the Plaintiffs are "qualified individuals" since they did not receive DHS level of care determinations. In this Order, the court does not rule that Plaintiffs are not "qualified individuals" under the ADA since the population limits have been reached. If that were the case, the State would have the unfettered ability to discriminate against individuals through poorly administrated programs.

Other cases hold that denying disabled individuals a choice between institutional and home-based care violates the ADA non-discrimination policy since it unnecessarily segregates the individuals. *See Cramer v. Chiles*, 33 F.Supp.2d 1342 (S.D.Fla.1999) (holding that, under the ADA, Florida cannot deny Medicaid eligible individuals a choice between institutional and home-based services). .

Thus, the Hawaii statute could potentially force Plaintiffs into institutions in violation of the ADA's non-discrimination policy since the State's Medicaid statute fails to offer all qualified disabled people services in the "most integrated setting possible." Since the State provides the HCBS–MR services, it cannot discriminate against the disabled by denying them services in an "integrated" setting since that could constitute unjustified isolation.

Consequently, under the ADA's regulations, if the State violates the ADA's integration mandate and discriminates against individuals, it must make modifications to remedy the situation. However, the ADA regulations and the *Olmstead* Court qualify this requirement with the "reasonable modification" clause that "allows states to resist modifications that entail a 'fundamental alteration' of the state's services and programs." *Olmstead*, 119 S.Ct. at 2188; 28 C.F.R. § 35.130(b)(7). Concerning the meaning of "fundamental alteration," the Court held as follows:

> But we recognize, as well, the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand.... In evaluating a State's fundamental-alteration defense, the District Court must consider, in view of the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably.

*Olmstead*, 119 S.Ct. at 2185. As a result, if a state is found to have discriminated against disabled individuals through the administration of a program, it must modify the program to remedy the situation unless it can prove that any modification would fundamentally alter the program.

In this case, Defendants argue that any modification to the program would require them to ignore State funding limits and, therefore, fundamentally alter the HCBS–MR program to an unlimited state funded program. Further, it claims that requiring the State to ignore the population limits is a fundamental alteration. Also, the State argues that providing more individuals with services would force it to exceed its federal funding limits, making it take on 100% of the costs of these additional individuals' care. These arguments fail to show how the modification would fundamentally alter the program, since it merely argues that the State would potentially have a problem funding it. Also, the court would not expect the State to provide 100% of the funds, but would analyze whether the State could amend the "population limits" approved by the HCFA to provide for more individuals. It would not be an unlimited program as Defendants claim.

Another argument is that forcing the State to provide services to all qualified individuals would force it to reconsider the program, its eligibility criteria, services provided and whether to terminate it. This argument lacks substance since it fails to show that the modification itself would alter the program.

Finally, the State argues that the court must take into account the State's available resources and other programs that it has undertaken "for the care and treatment of a large and diverse population of persons with mental disabilities," citing *Olmstead*. Defendants claim that requiring that all eligible individuals be admitted to the program would necessarily decrease ICF–MR funding, which would be inequitable to that program. The court acknowl-

edges these potential problems and it will consider all relevant facts in determining whether a modification of the program is prudent in light of the State's other undertakings. Under the Act, a court must examine the State's current program and require feasible modifications that do not alter the program in such a way that will cause other programs to suffer unjustly. However, Defendants have not shown that any modification to the program would fundamentally alter it.

Plaintiffs claim that modifications are possible in this case if the State would responsibly develop its program. Plaintiffs alleged that HCBS–MR services can be provided at one-fourth the cost of ICF/MR services. Plaintiffs also claim that Defendants intentionally underfund the program and mismanage the wait list, forcing the "qualified individuals" to accept institutional services. Plaintiffs cite to *Williams*, 937 F.Supp. at 524, to show that a "reasonable modification" would be to require the State to allow Plaintiffs a choice between home-based care and ICF/MRs. In that case, the court held that forcing the State to make home care available to residents of a nursing home was a "reasonable accommodation" under the ADA because the home-based care was less expensive.

Additionally, Plaintiffs do not seek a modification of the HCBS–MR program that will require the State to provide the entire class with services. It simply requests that the State be required to responsibly develop the program in such a way that will allow the HCBS–MR wait list to move at a reasonable pace.

The *Olmstead* court held that if the State could prove that it was developing a "comprehensive plan" to keep the wait list "moving at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable modifications standard would be met." However, the State has provided no evidence of any such plan. The only evidence of any effort to decrease the wait list is the increase in "slots" over the next few years.

That single piece of evidence, though, does not show that the State is complying with the ADA by acting responsibly.

In sum, the ADA requires the State to administer its waiver program in the "most integrated setting appropriate to the needs of qualified individuals." There are material questions of fact surrounding whether reasonable modifications should be made. Also, if any reasonable modifications should be made, there are material questions of fact surrounding whether they would "fundamentally alter" the program in violation of the ADA. Therefore, Defendants' Motion is DENIED to the extent it seeks summary judgment on Plaintiffs' ADA cause of action.

### 7. The Rehabilitation Act Claim

 As determined above, the State does not have Eleventh Amendment immunity under this Act because of valid Congressional abrogation. *Clark*, 123 F.3d at 1270. Therefore, if Plaintiffs have a claim under the RA, they are not barred from bringing it against the State.

Section 504 of the RA states, in pertinent part:

> No otherwise qualified individual with a disability ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). Further, one of its implementing regulations mirrors the "integration mandate" of the ADA. *See* 28 C.F.R. § 41.51(d).

Though the RA appears to provide the same requirements as the ADA, Defendants argue that the Rehabilitation Act does not apply to the HCBS–MR program since the RA cannot provide for more than Medicaid provides and the RA does not create positive entitlements. Defendants rely on *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), for this assertion, since it rejected an RA chal-

lenge to a benefit reduction under the Medicaid statute. The case also stated that Medicaid only assures that individuals will receive "adequate health care," not care tailored to their needs. *Id.* at 303, 105 S.Ct. 712. Though this may be true, it does not tell the complete story. The court also held that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers." *Id.* at 301, 105 S.Ct. 712. Also, "to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Id.* Thus, under this case, the "integration mandate" of the RA appears to set the same standard as the ADA provision.

As a result, this court concludes that the RA require a consideration of whether the State's HCBS–MR program fails to provide services to Plaintiffs in the "most integrated setting appropriate." Then, if the program fails to provide appropriate services, the court must consider whether reasonable accommodations can be made without fundamental alterations. Thus, since the court determined that there are questions of material fact surrounding these inquiries, the court DENIES Defendants' Motion to the extent it seeks summary judgment on the RA cause of action.

## CONCLUSION

For the reasons stated above, the court DENIES Plaintiffs' Motion for Partial Summary Judgment, DENIES Plaintiffs' Cross–Motion for Partial Summary Judgment, and GRANTS in part and DENIES in part Defendants' Motion for Partial Summary Judgment.

IT IS SO ORDERED.